I see a lot of these, do you see a lot of these? I see a lot. All right. Ms. Thank you, Your Honors. May it please the court. My name is Joanna Martin, and I'm here representing Palm Valley Healthcare, Inc. Can you speak up just a little bit? Yes. May it please the court. My name is Joanna Martin, and I'm here representing Palm Valley Healthcare, Inc. While I hate for this to have to eat into my time, I want to make sure that it's clear that this is a case not about healthcare fraud. So this is a home health agency that went through a paper audit. There's no allegation of doctors submitting false claims. There's none of that here. Services that were provided by— And that's why I'm wondering, I'm just a little bit confused about, given that home healthcare services provide like therapists and nurses and so forth, that have to be certified by a doctor, as we heard just this last case, how can they know that the person isn't in need of home healthcare if they're relying on a doctor's certification? Well, so I think it's important to look at this case in the context of when services were provided. We're talking about 2006 to 2009. And this was at a time before Medicare regulations and sort of the manuals had changed and involved into what we have now. And at the time, the Medicare Act and the regulations said, as you were pointing out, said that really what needed to happen is you needed a doctor to certify a patient's condition to sort of— This is actually a friendly question. I'm trying to understand how Palm Valley Healthcare is supposed to know that the doctor's certification is wrong. I don't know how they're supposed to know. So I don't even understand this whole setup. Assuming that we don't have fraud, collusion, kickbacks, and all the stuff that was argued in the last case, how does it make sense that the doctor certifies someone, Palm Valley provides the service, but then Medicare can come back later and undercut what the doctor did? I mean, is that what happened here, or am I misunderstanding? I'm a little bit confused about the overview, the big picture of this. That's not supposed to happen. Is that what happened here? But that's what happened here. And so going back to what I was saying about 2006 to 2009, what was supposed to happen is the ZPIC, health integrity, was supposed to come in and audit Palm Valley's paper, audit their medical records prepared by the nurses that go out into the home contemporaneous with the services that are rendered, audit the records, and then decide whether or not Palm Valley met conditions of payment based on the documentation. What happened here, though, was not only was there a paper audit, but then above and beyond, the contractor sent out individuals into beneficiaries' homes years after the fact. And we're talking about older folks. We're talking about people that are in their 80s and 90s, sent out investigators after reviewing the documentation, sent them out to interview these beneficiaries, interview their families, and then determine based on that that there was... Who are they supposed to talk to? I mean, you argue that these interviews aren't relevant. I mean, I agree they might not carry the day. They might not in and of themselves be enough, but you go talk to the patient and say, what do you remember about five years ago? I mean, it's certainly relevant whether it's, you know, you might be able to impeach it or cast doubt upon it, but how is that to actually go ask the person who was getting the services what was going on five or six years ago? What was your condition? What were you doing every day? Well, so one of the things that I want to clarify for the court here is that this was supposed to be a paper audit. I understand if there's an allegation of fraud. I understand if sort of there is some kind of issue that additional resources of the government have to be spent to send out contractors into the field. That's not supposed to happen, and that wasn't supposed to happen. I mean, you're saying the government can't send out people to further investigate? No, I'm not saying that at all. If there is a reason or a justification or a basis for that, the government may very well do that, and as the court heard, there are investigations where patients are interviewed, and that is taken to sort of an investigation level. So someone can't sit here and decide who to audit and further investigate? They can. I mean, that's up to them. They can. The reason that Palm Valley was selected for this audit in the first place is because they were giving – they had patients on care for five episodes. Right, it's a flag. There's billions of dollars. They run these flags that show discrepancies, high charges in this case, giving continued services abnormally, and then they go and investigate. I mean, it's a civil – take the last case we just had, which was criminal. I mean, the government there could have said, oh, we don't want to look at this criminally, but we're going to do a – Medicare could do a civil audit and investigate it that way. So, I mean, just because there wasn't a criminal prosecution here doesn't mean the government can't investigate whether there's problematic billing practices. No, it doesn't mean that they can't. But, one, there's a difference between a case like Palm Valley's and a criminal case because at the end of the day, we don't even know who these investigators are. They're employees of the contractor that go out – And your liberty is not at stake, so the protections aren't as great as they are. That's always the case in criminal versus civil proceedings. Yes, I understand. But what you have, in effect, is an interview that's conducted outside of the scope of the medical record, and then that interview is sort of the dialogue that is controlled by the contractor. I'm trying to understand something more fundamental. I completely understand the concepts that they can do an investigation, particularly if there is a concern about fraud and maybe can uncover a fraud. But assuming, arguendo, that's not the situation here because nobody said it is, then I don't understand why the home health care entity cannot simply rely on a doctor's – the 485, the certification saying Ms. X needs four weeks of two-times-a-week leg therapy, and you take that document and you send your nurse and your nurse documents. I went twice a week for four weeks to Ms. X's house, and I gave her the leg therapy. That's your paper audit. If that part is true, the nurse provided the service, how can it be Palm Health's fault that the doctor was wrong and actually she could have come into the office if she'd tried harder? That's the part I'm trying to understand. That may be just totally me, but I don't get the big picture here because it seems like you have to get a doctor's certification. Why can't you rely on that? What am I missing? Right. You have to get a doctor's certification. I don't know that there's anything to miss here other than this audit and the way that this overpayment assessment was made was outside and above and beyond what should have happened, which is you have a proper doctor's certification and you have medical records that then are reviewed and that determine were conditions of payment met, and that's not what happened here. What happened here was health integrity went outside of the doctor's medical decision authority, outside what was in the records, went and conducted an independent investigation that you really don't have an opportunity to challenge, and they determined an overpayment not based on what was supposed to happen, which is an overpayment audit based on records. I thought there were four levels and now you're here. All these administrative levels, then district court, now what do you mean you don't have an opportunity to challenge their investigation? At what point in time do you have an opportunity to know who the investigators are, what qualifications they have to conduct interviews, under what context or under what pretext the interviews were conducted, and as a matter of fact, one of the issues that we raise here is a due process claim, and I know that this court before in Maxmed said that sort of getting your evidence right before your ALJ hearing isn't that big of a deal, but to your point, Your Honor, in Palm Valley's case you don't really get to see the interview notes until you go to the ALJ and formally make a request and then the ALJ has to instruct the contractor to then produce the records. Which level is that at? And that's the third stage of the appeals process, the ALJ level. So you don't really have an opportunity to, and even then, by the time you get the interview notes from the contractor on order from the ALJ, all you have is the paper there. You don't have an opportunity in any way, shape, or form to go back and say, well, wait a minute, why did you go back to this 89-year-old person and ask him two years later if they could drive? Of course they're going to say that they can drive, but the documentation, you have a valid doctor's order, and the documentation supports that. And, in fact, in most of the homebound denials that were made by the government here, the beneficiary was properly certified by the doctor to qualify for home health, but also Palm Valley's records supported a finding of homebound status. But because the contractor went and sort of did an investigation to uproot all that, an independent investigation, not looking at the proper certification, not looking at what the medical records held, because they did that above and beyond the investigation and were able to use that evidence, that negated the authority that the doctor had. Because they have to rely on the doctor. But if they can't rely on the doctor because Medicare could come in five years later and undercut that, I don't understand how the home health or care agency can work. That's why I may be missing a major point here. This wasn't really addressed in the briefing, and it bothered me because I felt like talking about whether there's evidence and this person says I was fine, well, that is some evidence that they were fine. But I'm moving back to say why is the home health care person reliable for the doctor's misunderstanding of their own patient? That's what I'm trying to understand. What am I missing there? Your Honor, that is, I think, exactly the problem with this case is that Palm Valley is not expected to know that. But you are aware of the cases out of this court on these very issues, on these billing issues where the home health care people didn't play cards with the patients but didn't give, they recognized the patient didn't need what the doctor certified and they kept showing up even though they knew there was nothing wrong with the patient. But that's not what happened here at all. No, but in response to Judge Haynes' question, there are cases where that happens. Yeah, but that's not, I mean, that's a different question. Sure, if I show up and somebody just finished their marathon and I'm supposed to be giving them therapy because they're homebound, I would have a problem with that. I get that. But do we have that here? I mean, this is my problem. We don't have fraud. We don't have collusion. We don't have, so what do we have? The government, the way it's supposed to work is you have a health care provider submit their medical records, and the payor, they're not supposed to say, well, the patient was this, that, and the other. The medical decision was wrong. What the payor says is, based on the documentation, you didn't meet our conditions of payment. We don't see that you met this and this and this, and in the records as we see from you, we decide not to pay that claim. The payor, the government is not supposed to say. There's a whole overpayment scheme. I mean, there's a whole administrative apparatus to deal with alleged overpayments for Medicare. There's no intent requirement. I mean, there's no, right, you don't have to show fraudulent intent on the provider, Medicare provider's part, and it doesn't have to just be home health care. I mean, if a hospital, Medicare decides that a hospital was unnecessarily doing X-rays on people or MRIs on people, there's this whole administrative, I mean, this whole apparatus exists. You don't like the result in this case, but this apparatus exists to decide when there's overpayment, which doesn't require a finding of fraudulent intent, right? So a hospital could have done all these MRIs, and if five years later, Medicare comes in and shows those weren't necessary. We know some doctor at the hospital obviously ordered an MRI, but that was not necessary that that hospital would have to pay back Medicare, right? I mean, that's the way it works. One of the reasons that Palm Valley has decided to pursue this appeal is because this audit killed the company. So this is a $12 million overpayment, and the way that home health care works is you have episodic payments. So you get paid for two months of care. Average amount of payment is about $3,000. I heard earlier Your Honor say that home health is more expensive, but it's not, because it takes the place of an institutional setting of care, or it takes the place of the patient going to the doctor, maybe, going to the doctor two or three times a week until you have a nurse come in for $25 a pop. You have a nurse come in and care of the patient and keep them out of the hospital. And so, anyway, the point is that you have two months of care, and it's paid on that set basis. Let me ask one question procedurally about this case. I know at the end of the day Medicare wants this big repayment from you, your client. Are they seeking recoupment? Because I think all the cases you cite with due process where there's been problems with due process because of delays in the proceeding, it looks to me like they're all recoupment cases, where the government's not just saying at the end of the day you owe $6 million, but they're actually withholding, they're taking away from your current billings and holding money you might otherwise be entitled to. Is there a recoupment aspect to this case, or is the government just asking at the end of this whole proceeding, if they win, you write us a check? There is a recoupment aspect to this case because recoupment occurred at various stages of the case, and when Palm Valley was more operational, that's when the recoupment occurred because there was money to take. Have they shut down now? I believe that they are still operational. You have to sort of render care to the community in order to exist in the first place as a Medicare certified health care provider, so I think they are operational, but I think they're serving maybe a patient or two just to stay alive. But going to your point about due process, one of the issues brought before the court is, and I realize that I'm out of time, but the district court had found that sort of escalation was a proper remedy to any due process violation, and I wanted to bring that up before the court. I know the Fifth Circuit recently ruled in family rehab and sort of the other cases across our jurisdiction that escalation is not a proper sort of cure to the violation. Good morning, and may it please the court. Courtney Dixon from the Department of Justice on behalf of the Secretary. Maybe I'll start where plaintiffs left off about the due process clause question. I want to make clear another distinction in this case from the cases that they cite. Judge Costa, that you mentioned, those cases are parties currently in agency proceedings that are seeking in the agency proceedings to either compel an immediate ALJ hearing or to have recoupment temporarily suspended before they get an ALJ hearing. That's quite different from what plaintiffs are doing here, which is after having five levels of administrative review and raising nothing to call into question the reliability of that review, are seeking to have an overpayment at termination permanently set aside merely because statutory deadlines were violated. And that's not, that doesn't look like a due process clause claim that this Court has recognized, and indeed this Court has made clear, as other courts have, that there's no procedural due process clause claim from the mere violation of a statutory deadline. Do you agree with Ms. Martin that this is not a case involving fraud or collusion or kickbacks or anything that we heard in the prior case, the allegations of the prior case? Counsel didn't make any such findings, Your Honor. Okay. And the point that Chief Judge Owen referenced of knowledge by the home health care provider that the person was actually running marathons are fine. Any indication of that? Well, I think so, Your Honor. Maybe not running marathons. I don't want to go that far. But to go to your earlier concern about how a home health agency is supposed to know, this is a continuing relationship, Your Honor. Home health periods are 60 days, and then there's recertification for further days. And of course, Palm Valley was audited in the first place by Medicare because they ranked number one in the state of Texas for continuous episodes of home health care treatment. They had five or more continuous episodes. There's a demented patient living at home who refuses to move into assisted living or some other place and isn't able to travel on his own and so on and so forth. And so they provide therapy. The person gets a little bit better. They stop the therapy, gets bad, starts falling again. So they provide the therapy again and so on and so forth. I mean, you can have recurring people because of that. And I think that that goes to the thoroughness of the counsel's discussion here, Your Honor. The counsel looked at the start of care for the beneficiary. They looked at the home health care episode immediately preceding the one that was audited. They looked at the one that was audited, and then they took into account the beneficiary interviews. And those asked about the dates in question in addition to looking at the beneficiary now, which is still relevant given that, as Your Honor has mentioned in the first case, a lot of these conditions are degenerative. And the beneficiary interviews, although not the only thing relied on by the counsel certainly, were relevant to the counsel. Are you aware that people that are devolving mentally don't always know they are and they think they're fine? That may be the case, Your Honor, but I think that speaks to some occasions the beneficiaries asked spouses of the – sorry, the beneficiary interviewers asked the spouses of the beneficiaries. I mean, I get that with other members and so forth, and I get that it's not irrelevant what the person thinks of themselves. I'm just not sure it's determinative. And I don't think that the counsel hung their hat only on the beneficiary interviews. But I'm trying to understand. Are you saying there is an undercurrent of they did know that these people did not need home health care? Is that really the answer to my question about how this works? Because it's complicated in my view that you all can just come back after the fact, require doctor certification, but the doctor certification can be undercut having already paid the home health care, not denied it in the first instance, but having already paid them, and now you want the money back. Maybe, Your Honor, his concern will be alleviated by Section 1395PP of the Medicare statute, which provides for waivers of overpayment determinations if the provider could not reasonably have known that the services weren't provided. Okay. That was the statute that was invoked by the Tenth Circuit in the Caring Hearts decision that the appellants rely on, Your Honor. And so if a circumstance like that exists, there is a statute that recognizes exactly, Your Honor. So that's the answer is you need to show you didn't know and then you won't. Reasonably could not have known, Your Honor. Couldn't have known. And perhaps in this case because this— Or a gray area. I mean, you would have to admit this definition of homebound lends itself to some gray areas. It does, Your Honor, and— Because it's not, you know, takes a village. It lends itself to some gray areas, Your Honor, and I think in this case, because this is an administrative proceeding, there's, of course, the substantial evidence standard, and the counsel, of course, looked thoroughly— The civil overpayment, the government doesn't have to prove fraudulent intent or they— As you said, they can invoke the statute maybe on their side, but the government doesn't have an affirmative obligation to prove fraud or that they knew these people weren't entitled to payment. No, Your Honor. The question is whether the payments are reasonable and necessary under the Medicare statute. It's plaintiff's burden to demonstrate that, and they— And they know when they sign up for Medicare that this is part of the deal. They may be subject to an overpayment proceeding. Yes, Your Honor. And, of course, Congress has explicitly allowed Medicare to do these overpayments. That's Section 139. But the answer is what you just said, that if they—if it was a gray area and they were relying on the doctor, they can put on evidence of that, and they didn't here, is what you're saying. They didn't provide that evidence here, Your Honor, and I don't take that to be the kind of attack that they were making to the agency determination. They were challenging the substantive determination as they have in this Court. Yeah, I get that. I was—I've just been trying to understand the overview, and thank you for helping me with that. Certainly. I'm happy to direct the rest of my presentation. Any other specific questions that the Court may have? The counsel's opinion here is 86 pages long. It's quite thorough, and the district court looked at that thoroughly, so I don't have anything further unless the Court has any specific questions. Thank you, counsel. Thank you very much. Thank you. I wanted to turn back to a point that I was trying to initially make and that the government made in her response argument, and that sort of what evidence did Palm Valley show to substantiate that it sort of met the conditions of payment and that it should have been paid? And again, in 2006 to 2009, and this goes to the Caring Hearts decision, what Palm Valley was supposed to show was a valid doctor's certification and then evidence that the patient exhibited a condition that made it hard to leave the home. And these other additives of considerable taxing effort and inability to leave the home, those were not mandatory requirements at the time. Now, they became mandatory requirements by the time the counsel made their decision in the Medicare benefit policy manual, but at the time, 2006 to 2009, what was required was a valid doctor's certification, and Palm Valley's notes must have shown that condition that made it hard for the patient to leave the home. And in the decisions that we have from the counsel that go to homebound status, there is not one instance where that medical condition was not shown. It's that the ZPIC then went above and beyond outside of the records, so to speak, to conduct these interviews and find additional evidence, sort of collateral evidence, to dispute the doctor and dispute the record. And I just want to make sure that the burden that Palm Valley has is not conflated with the obligations that it has to follow a doctor's order. When a doctor, let's say from a hospital, refers a patient to home health, Palm Valley then can't say, well, no, doctor, you're wrong, the patient is not homebound, they don't need home health care. That's not the duty here. If they have a valid order from the doctor. Counsel opposite said you could have presented that under this stat, the 1395PP. You could have shown that, hey, I had no reason to think that this was a fraud by the doctor or wrong by the doctor, and therefore you can waive the overpayment. So the doctor could have been wrong, but you had no reason to question that or know that was wrong, and therefore you would still get paid. How come you all didn't assert that? I believe that we did raise that argument. It may not have been to this court, but we did raise that argument. And just from my experience with Palm Valley and the other cases that deal with this, once an overpayment is determined, it's hard for a provider to show then that they really didn't know or they didn't have reason to know that the services were medically unnecessary. Once an overpayment is determined, it's almost sort of a, well, you have an overpayment, you must have known, should have known. You had resources to go interview these people and their families, and they encountered the interviews, didn't you? They identified, to extrapolate, they had individual cases, and you all, your client could have gone back and presented different evidence, it would seem to me, based on the samples. Yes, while that may be true, that's not, again, that's not what's supposed to happen in these types of cases. This isn't a fraud case. This isn't a police investigation. No, but you're contesting the statistical sampling and saying it's invalid, and we can show it because our interviews of these people show something different than the after-the-fact interviews that were conducted here. And, Your Honor, I think that what happened in this case was the documentation was strong, at least strong enough in Palm Valley's mind to show that, one, there was a valid doctor's order, and, two, that the patient possessed a condition. If somebody writes in the file, the patient possesses this and follows, it doesn't mean that that's happening on the ground, and the government certainly has a right, and I hope as a taxpayer they do, to do spot checks and say, are these people, is this what's really happening? And if there's a discrepancy as to what's in the written record based on what people are telling them, then somebody needs a hearing, and isn't that what you got, your client got? So, one, we have a doctor that really verifies that the patient is homebound and has this medical condition, so it's not just the home health. We don't always know that that's accurate, and it's possible that the doctor could be shading it. It's possible that the records could be overstating it. There's an audit, and the audit says it's overstated. This patient is not as bad off as the doctor, and your records reflect. It seems to me you still have the opportunity to prove, no, our records were correct, based on interviews of the patient and the patient's family. And that's what, well, and that's what Palm Valley tried to argue, is that the records made contemporaneous with the care are correct, and we stand on those records. And unknown individuals going out into the community, questioning Medicare beneficiaries about their benefits, that is not in any way, shape, or form sort of counter to the records. We have your argument. Thank you.